United States District Court
Southern District of Texas
**ENTERED**
March 03, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BROOKE PEARCE, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:18-CV-03196 |
| | § | |
| DOE FBI AGENT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OF FINDINGS OF FACT,**
**CONCLUSIONS OF LAW AND FINAL JUDGMENT**

## I.        INTRODUCTION

This case was tried to the Court on October 17, 18 and 21, 2024.[1]  After the evidence was concluded, the attorneys presented their arguments for relief.  The Court took the matter under advisement and now concludes the matter by entering its Memorandum of Findings of Fact, Conclusions of Law and Final Judgment.

## II.       FACTUAL BACKGROUND, BASED ON TESTIMONY AND STATEMENTS AND EXHIBITS

The evidence shows that on January 24, 2018, Mr. Ulysses Valladares, Sr., and his son Ulysses Valladares, Jr., were kidnapped by Nicholas Cunningham and Jimmy Sanchez and were held hostage at their home.  At some point during the day, the kidnappers moved Valladares, Sr. to another location, leaving the son in the Valladares' residence.  The FBI was notified, and a taskforce joined local law enforcement in an effort to rescue Valladares, Sr., ["the hostage"].  The agents met, developed and discussed their tactical plan and assigned roles for each member or

---

[1] At the time of trial, the plaintiffs were Ulysses Valladares, Jr., and Justina Garcia.

team.  However, before they could proceed, one of the kidnappers was captured and disclosed that the hostage was being held at a house on Elbert Street in Houston, Texas. The teams met again and were briefed on any needed changes to their plan.  Agent Gavin Lappe[2] and Agent Jeffrey Hawkins were assigned to the south side of the house where the hostage was being held.

Agent Hawkins was tasked with "porting", or breaking out, a double pane window to the room where the FBI learned the hostage was being held.  Agent Lappe was responsible for providing "cover" for Agent Hawkins as he ported the window.  Agent Lappe, therefore, took a position adjacent to the exterior of the house permitting him to have an angle from a side of the window that was to be ported yet, out of view from inside the room. Another team was tasked with breaching the front door to the house, entering the residence and rescuing the hostage.  Neither Agent Hawkins nor Agent Lappe was tasked with providing cover for the team that breached the front door.

Agents Hawkins and Lappe stationed themselves at the window nearest to the front of the house, where the hostage was being held, and waited for the signal to port the window.  Upon hearing the command "breach", Agent Hawkins was to port both panes in the window and move away.  He had been provided a Halligan tool for that purpose.  When the command was given he struck the first pane but lost control of the tool as it dropped through the broken pane into the house.

Agent Hawkins, nevertheless, moved quickly past the window as Agent Lappe focused on and any visible or threatening movement in the room.  As Agent Hawkins moved past the window, he stated that he looked back and saw the silhouette of a person through the window.  At or about

---

[2] Agent Gavin Lappe was sued by the plaintiffs as Agent John Doe because the FBI refused to disclose his identity. Agent Lappe identity has been disclosed and he is identified as the agent who shot the hostage on January 25, 2018.

the same time, Agent Lappe fired two rounds through the window hitting the silhouette in his left side. The person shot, fell backward to the floor where he immediately died. Agent Hawkins stated that he did not see Agent Lappe shoot through the window and did not know where any gunshots came from.

Agent Hawkins, in both his statements and deposition, stated that after the command was given and he ported the window he moved out, but looked back at some point to see a person "leaning out the window". He testified that Agent Lappe told him that that same person "grabbed his weapon" as he fired it. However, Agent Hawkins did not testify that he witnessed the discharge of Agent Lappe's weapon, but heard Agent Lappe state later "I shot" [him] [as] "he grabbed my gun."

An examination of the hostage's hands and body reveal that he never was in contact with Agent Lappe's weapon. A review of a photograph of the window and considering the speed with which events developed does not square with Agents Hawkins and Lappe's statement. The hostage was either standing on the couch or behind the couch at the time he was shot. Neither of these positions nor the size of the opening in the window permitted the hostage to extend himself out the window. Equally, the evidence reveals that he was still blindfolded and could not see the Agents.

Sophia Perez Heath gave live testimony in the case that contradicts Agent Hawkins statement and also refutes Agent Lappe's outburst. She had been persuaded by the kidnappers to assist by holding the hostage at her residence. At the time, Heath and her mother were the only occupants in the house. The hostage was bound with gray duct-tape around his wrists that prevented him from using his hand in any meaningful or threatening manner. He could not feed himself. He was blindfolded with a black bandanna, according to Heath. Throughout the ordeal,

neither his hands nor the blindfold was removed.  He was carried into Heath's bedroom and placed

on a couch where she fed him.  Later, Heath laid on her bed across the room away from the hostage

near a small lamp that was on a dresser.

      The hostage was placed on the couch that was situated beneath the window that Agent

Hawkins would later port.  At all times, the hostage's back was to the window.  He did not leave

the couch until he heard noise on the roof and shouting.  When Agent Hawkins broke the window,

awakening Heath as she lay on her bed, she raised up in the bed to see the hostage rising to his feet

from the couch and turn toward the window as the glass and tool feel into the room.

      According to Heath, the hostage may have stood on in the couch and faced the window as

through he would pull back curtains that covered the now broken window.  He was instantly shot

and fell to the floor between the couch and her bed.  According to Heath, the hostage was still

blindfolded and never extended any part of his hands or body through the broken pane.

## III.  SPECIFIC FINDING OF FACT AND CONCLUSION

      Based on the undisputed evidence and based on the reasonable inferences to be drawn from

the evidence, the Court makes the following additional findings of fact, that are supported by a

preponderance of the evidence, as follows:

    A)     Agent Lappe's role in the rescue operation was to provide cover for Agent Hawkins
          as Agent Hawkins was to port the two panes of a single window outside the room
          where he and Hawkins were assigned.  This window was the window nearest the
          front of the house;

    B)     Agents Hawkins and Lappe were to create a distraction as the rescue team breached
          the front door and rushed into the room where the hostage and kidnapper were
          located;

    C)     From the activities of all Agents involved, it is reasonable to infer, and the Court
          does from the evidence, that the rescue team, including  Agents Hawkins and Lappe
          assumed that the hostage was located in or near the room where the window was
          ported.  Within seconds of the agreed signal and breach of the front door by the

rescue team, the hostage was shot, before the rescue team entered the bedroom where he was being held;

D)    At the time of the signal and during the porting of the window, Agents Lappe and Hawkins were able to see a silhouette immediately appear through the window as the hostage rose from the couch.  The hostage immediately turned toward the window under which the couch was stationed;

E)    When the hostage turned his body and attention to the window, he was immediately shot by Agent Lappe.  The slug entered ". . . the dorsal left arm – located 8 ½ inches below the apex of the left shoulder.  The slug traveled "diagonally . . . left to right . . . front to back . . ." exiting through the right side of the hostage's back.  *See* [Autopsy Report];

F)    Neither Agent Hawkins nor Agent Lappe could be seen by the hostage because he remained blindfolded and there was no light outside that side of the house that exposed the Agents.  Moreover, the lamp in the room where the hostage was being held illuminated that room.  Hence, the lamp light served as a "blind" preventing the hostage from seeing through the window;

G)    Contrary to any statement(s), reports and/or remarks by Agents Hawkins and Lappe, there is no evidence that the hostage leaned out the window, was able to see either Agent, pointed his hands through the window toward either agent, grabbed Agent Lappe's weapon, or in any manner threatened the safety of the Agents.  Statements by the Agents otherwise are not only untrue and unsupported by scientific evidence or logic, they represent intentional falsehoods.  Agent Lappe never warned Agent Hawkins that he should take cover, or that they were in any respect in danger.  Moreover, the autopsy report establishes that Agents Lappe and/or Hawkins' statements regarding the position of the hostage when shot are untrue and fabricated;

H)    Both Agents Hawkins and Lappe were trained and schooled regarding the use of deadly force.  On two occasions, prior to arriving at the Elbert Street address, the Agents were reminded of the circumstances under which deadly force was permissible.  The use of deadly force by Agent Lappe was not permissible use under the circumstances, which understanding is confirmed by the Agents' efforts to create a dangerous situation that would warrant the use of deadly force. *See* [Ex. 4, Policy Statement Use of Deadly Force]; and,

I)    Provision I(C) is the relevant provision of the deadly force policy.  It provides that . . . "[I]f feasible . . . a verbal warning to submit . . . shall be given prior to the use of deadly force."  Neither Agent Hwkins nor Agent Lappe gave a verbal warning to the silhouette that appeared in the window, prior to Agent Lappe discharging his weapon and intentionally and recklessly shooting the silhouette.  Agent Lappe's actions were not accidental or designed to warn the occupants in the room.  He fired a "kill" shot that in fact cause the death of the hostage, Mr. Valladares, Sr.  At the

time that Agent Lappe shot the hostage, neither Agent Hawkins nor Agent Lappe was within the frame of the window. Agent Hawkins was already racing toward the front of the house where his vehicle was located.

## IV.    THE LEGAL STANDARD

The FTCA waives sovereign immunity permitting lawsuits against the United States for claims arising under state law for the recovery of damages. 28 U.S.C. § 2674. The effect of this statutory construct is to permit lawsuits against the United States "in the same manner and to the same extent as a private individual under like circumstances." *Spotts v. United States*, 613 F.3d 559, 566 (2010). In this respect, the FTCA waives sovereign immunity when, for example, a law enforcement officer commits an intentional tort, an assault, batter, conducts a false imprisonment or false arrest, abuse of process, or engage in a malicious prosecution. 28 U.S.C. § 2680(h); *see Millbrook v. United States*, 569 U.S. 50, 52-53 (2013).

The FTCA grants to district court's jurisdiction to hear and resolve claims against the United States for negligent or wrongful acts of its employee, such as federal agents. 28 U.S.C. § 1346(b)(1). ("Where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."). However, waiver of the sovereign immunity of the United States is not without limitations; there are exceptions to a recovery. *Gonzales v. United States*, 851 F.3d 538, 543 (5th Cir. 2017); *see also Spotts*, 613 F.3d at 566.

An exception to a waiver of sovereign immunity is the "discretionary function" exception that is set out in § 2680; *see also United States v. Gaubert*, 499 U.S. 315, 322 (1991). "The discretionary function exception withdraws the FTCA's waiver of sovereign immunity in situations where, although a government employee's actions may have been actionable under state tort law, the actions taken were required by, or were within the discretion committed to that

employee under federal statute; regulation or policy." *Id.* Title 28 U.S.C. § 1346(b) provides in relevant part:

> The provisions of this Chapter and § 1346(b)of this title <u>shall not</u> apply to [a]ny claim based upon the act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance so the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employees of the Government, whether or not the discretion was involved. [Emphasis supplied.]

*Gaubert,* 499 U.S. at 322 (citation omitted).

In *Gaubert*, the Supreme Court explained that "[t]he exception covers only acts that are discretionary in nature, acts that involv[e] an element of judgment of choice. Hence, it is the status of the actor that determines whether the exception is applicable. 499 U.S. at 322 (citations omitted). In essence, it is not the policy or administrative decision that is not the subject of review by the Court. Instead, it is the judgment or choice of the employee that is subject to judgment.

*Gonzales* teaches that a trial court engages in a two-prong test when determining whether the exception applies. *Gonzales,* 851 F.3d at 543. First, "the conduct must be a matter of choice for the acting employee; and, second, the "judgment [must be] of the kind that the discretionary function exception was designed to shield." 851 F.3d at 544, quoting *Spotts*, 613 F.3d at 567 (quoting *Berkovitz v. Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954); and *Berkovitz by Berkovitz*, 486 U. S. at 536, 108 S.Ct. 1954; accord Tsolmon, 841 F.3d at 382). Both prongs must be met for the exception to apply *Gonzalez*, *Id.* at 544.

## V.   ANALYSIS, DISCUSSION AND CONCLUSION

The United States has set forth four assertions concerning the plaintiffs' amended complaint that it contends shields the government from liability. First, the United States argues that subject matter jurisdiction is lacking because the "discretionary function" exception preserves

sovereign immunity; second, the plaintiffs have failed to plead an intentional tort under the FTCA; third, the plaintiffs' wrongful death claim fails as a matter of law; and, finally the plaintiffs' survival claim fails as a matter of law. The Court will address each of the United States' defenses in light of the plaintiffs' pleadings and the credible facts found by the Court from the evidence.

A.    *The Discretionary Function Exception*

The United States asserts that the plaintiffs failed to plead an intentional tort and has waived the right to amend its arguments and briefs, or otherwise respond to the government's claim of waiver. However, the United States admits that the plaintiffs' third amended complaint names the United States as the defendant and is brought pursuant to the FTCA for wrongful death, and a survival claim that it asserts that Agent Lappe committed an intentional tort. Therefore, the Court is of the opinion that the proper party is before the Court and the plaintiffs' complaint proceeds as an FTCA.

The Court is of the opinion that the plaintiffs have alleged acts of a negligence and gross negligence against the United States and that the United States' claim of waiver is unavailing. To sustain a negligence or gross negligence claim, the plaintiffs must establish a duty owed by the defendant, a breach of that duty, and in this instance, an unjustified abandonment of duty, and damages. The Court holds that Agent Lappe owed Valladares a duty to warn him before firing a shot through the broken window when neither his safety nor that of Agent Hawkins was threatened. As well he was obligated to maintain the decorum and duty to the office he held. He breached that duty recklessly causing the death of Valladares, Sr.

With respect to the two-prong test set out in *Gonzalez,* the question to be addressed by the Court is whether Agent Gavin Lappe used deadly force on the occasion was a matter of choice, and whether his judgment was of a kind that the discretionary function exception was designed to

shield.  Agent Lappe was authorized to use deadly force only in a circumstance where Agent Hawkins' or his life was threatened.  The Court determines that the discretionary function exception was not designed to shield the United States where, as here, Agent Lappe acted negligently, even grossly negligent, in shooting the silhouette in the window without knowing who he was shooting and, furthermore, when there was no threat directed toward him or Agent Hawkins. The evidence is conclusive, he shot the silhouette after Agent Hawkins had completed his assignment.

Therefore, the Court concludes that:  the Court has jurisdiction of the plaintiffs' lawsuit, the discretionary function exception does not apply, Agent Lappe was negligent, even grossly negligent, in his response to the situation on the occasion, and that the sole cause of Valladares, Sr.'s death was the shot(s) fired by Agent Lappe.  Hence, the Court holds that the plaintiffs are entitled to compensatory damages, economic and non-economic damages pursuant to Texas law. Tex. Civ. Prac. & Rem. Code § 41.001(8).

The plaintiff, Justina Garcia, is awarded damages as follows:  (a) $103,500, representing the loss of financial support derived from Valladares, Sr; (b) pecuniary loss, *i.e.,* value of advice, counsel services, care, mental anguish, past and future and loss consortium, in the amount of $500,000; and, (c) funeral expenses and travel associated with entry into the United States in the amount of $7,500.

The plaintiff, Ulysses Valladares, Jr.'s, is awarded: (a) $654,000, representing the loss of financial support based on his father's income; (b) $150,000 representing the loss of inheritance; (c) pecuniary damage in the amount of $500,000 representing the value of advice, counsel, services, care, maintenance, and parental support and mental anguish, past and future, and loss of consortium.

The Court also award the plaintiffs' attorneys' a reasonable fee of $475,000, representing approximately 25% of the total award pursuant to 28 U.S.C. § 2678.

It is so Ordered.

SIGNED on March 3, 2025, at Houston, Texas.

Kenneth M. Hoyt
United States District Judge